STATE v. LIVINGSTON BROWN.

(Filed 25 August, 1967.)

**1. Grand Jury § 1;    Constitutional Law § 30—**

A Negro defendant has no right to be indicted or tried by a jury composed of persons of his race or to have a person of his race on the jury, but does have a constitutional right to be indicted and tried by a jury from which persons of his race have not been systematically excluded.

**2. Same—**

A defendant asserting discrimination in the selection of the jury has the burden of proving such discrimination, but upon a *prima facie* showing the burden is upon the solicitor to go forward with the evidence to rebut such *prima facie* case.

STATE v. BROWN.

**3. Same—**

The granting of a new trial for discrimination in the selection of jurors has no relevancy to the subsequent trial in which the former errors and practices of the court in the selection of juries had been supplanted by unexceptional procedure.

**4. Same—**

The findings of the trial court in regard to racial discrimination in the selection of the grand and petit juries will not be disturbed when such findings are supported by competent evidence and there is nothing in the record to indicate any ill consideration of the evidence or infraction of defendant's constitutional rights.

**5. Same—**

While the fact that a disproportionately small number of Negroes had been selected to serve on the grand and petit juries in the county for a considerable period of time may be sufficient to raise a *prima facie* showing of racial discrimination in the selection of the juries, the absence of Negroes from a particular grand or petit jury is insufficient, in and of itself, to raise any presumption of discrimination.

**6. Same—**

Even though defendant's showing of a small disparity in the number of Negroes on the jury list for two consecutive panels be considered sufficient to make out a *prima facie* case of discrimination, evidence to the effect that the jury lists included, without indication or regard to race, the names of all persons on the tax books and the voter' registration books, without duplication, is sufficient to rebut such *prima facie* showing of discrimination, and the fact that persons whose names appear on the welfare rolls who were not listed on the tax or voter registration books were not included, does not alter this result.

**7. Criminal Law § 15—**

A motion for change of venue on the ground of unfavorable publicity in the county is addressed to the sound discretion of the trial court, and where the court's interrogation of those selected for jury duty fails to disclose prejudice, the denial of the motion for change of venue will not be disturbed.

**8. Homicide § 15—**

Testimony of decedent's dying declarations *held* properly admitted in evidence upon a showing that at the time of making the declarations deceased was in actual danger of impending death and had full apprehension thereof, and that death ensued some 24 hours after the assault.

**9. Searches and Seizures § 1—**

Where defendant consents to a search of his car, he waives his constitutional rights in regard to a search without a warrant, and such consent will render competent incriminating evidence obtained by such search.

**10. Criminal Law § 169—**

Where the record does not show what the answer of the witness would have been had he been permitted to testify, appellant has failed to carry the burden of showing prejudicial error.

STATE *v.* BROWN.

**11. Criminal Law § 167—**

The burden is upon appellant not only to show error but to show that such error was prejudicial to him.

**12. Criminal Law § 161—**

An exception and an assignment of error should show within itself the question sought to be presented, and a mere reference in the assignment of error to the page of the record where the asserted error may be discovered is not sufficient.

**13. Criminal Law § 138—**

The fact that defendant was given increased punishment upon his second conviction after a new trial obtained by him, *held* not ground for objection.

PLESS, J., concurring.

APPEAL by defendant from *Johnston, J.,* 28 November 1966 Criminal Session of RANDOLPH.

Criminal prosecution on an indictment charging murder in the first degree of Lucille Currie. Plea: Not guilty. Verdict: Guilty of murder in the second degree.

From a judgment of imprisonment, defendant appeals.

*Attorney General T. W. Bruton and Staff Attorney Theodore C. Brown, Jr., for the State.*

*John Randolph Ingram for defendant appellant.*

PARKER, C.J. This is the second time that this case has been on appeal before this Court. In the former trial, defendant Brown, after a plea of not guilty, was found guilty of murder in the second degree. From a sentence of imprisonment, he appealed to this Court. The opinion in the first appeal was filed 15 January 1965, and is reported in 263 N.C. 327. According to the record in the first appeal, he did not challenge the validity of the grand jury that found the indictment, either in the trial court or in this Court. On 26 July 1966, the Honorable Eugene A. Gordon, United States District Judge, handed down a memorandum opinion, which is not reported but is set forth verbatim in the case on appeal, in which he recites that petitioner has filed with his court a petition for writ of *habeas corpus,* accompanied by an affidavit of poverty. He further recites in his memorandum opinion: "The evidence of the petitioner tended to show that the 1960 census indicates that the white population was 56,369 and the Negro population was 5,105 in Randolph County. A compilation of the jury lists covering the period from February 1, 1960, to September 1, 1964, from the County Commissioners and the Clerk of the Superior Court of Randolph County reflect that

white persons numbered approximately 1,587 and Negroes numbered approximately 33. Further evidence reflects that Negroes on the jury lists were designated by 'c' or 'col.' Also, the grand jury which indicted petitioner and the petit jury which convicted him were 'all white.' The fact that the Negro population of Randolph County represents approximately nine per cent of the entire population and that only thirty-three Negroes have been placed on the jury lists in a 3½ year period established a *prima facie* case that there was systematic exclusion of Negroes from grand juries and petit juries because of race. [Citing authority.] The fact that the designations of 'c' or 'col.' were used on the jury lists to indicate Negroes also presents a *prima facie* case of systematic exclusion. [Citing authority.] The law of North Carolina is in accord. [Citing authority.] Since the petitioner established a *prima facie* case, the burden of going forward with the evidence is upon the respondent. [Citing authority.] The respondent offered no evidence on the issue of systematic exclusion of Negroes. . . ." Whereupon, he decreed and adjudicated as follows: "As petitioner has established a *prima facie* case of systematic exclusion of Negroes from the grand jury and petit jury due to race and the respondent has not shown by competent evidence that the institution and management of the jury system of the county was not in fact discriminatory, the indictment upon which he was tried and his conviction and judgment pronounced thereon should be vacated and set aside. The respondent, if it so elects, may reindict and retry the petitioner, provided such action is taken within the next six months. Otherwise, the petitioner will be discharged."

The practice in a *habeas corpus* hearing by District Courts of the United States of vacating months or years later indictments upon a point which should have been raised and decided in the trial court or in the Supreme Court of the state does not tend to inculcate respect for law and order or the reasonably prompt administration of justice. It seems that with countless petitions by defendants to review their trials upon a point that they had an opportunity to raise and did not in the trial court means that there is no end to criminal litigation. This is an utter negation of the legal principle *interest reipublicæ ut sit finis litium*.

The indictment vacated and set aside by Judge Gordon was found at the 22 June 1964 Session of Randolph County Superior Court. The indictment in the present case was found at the 28 November 1966 Session of Randolph County Superior Court. Before pleading to the bill of indictment, the defendant moved to quash the second indictment because Negroes were systematically excluded from service on juries in Randolph County because of their race, and assigns the following reasons for his motion: (1). At the No-

vember 1966 Criminal Session of the Superior Court of Randolph County the solicitor presented a bill to the grand jury that was all white, selected from a panel that had only one Negro on it. This was the grand jury that found the bill in the present case. (2) According to the 1960 Census for Randolph County, North Carolina, the Negro population of Randolph County was 5,106 and the white population was 56,360. (3) Since Judge Gordon's order, no effort has been made by the County Commissioners of Randolph County to correct this disparity between the number of Negro citizens in Randolph County and the disproportionate few in number selected to serve on juries, and the same token selection of Negroes has prevailed since Judge Gordon's order as proved by the September 1966 Criminal Session jury panel.

The defendant introduced in evidence the memorandum opinion of Judge Gordon, and affidavits showing that there was only one Negro on the jury panel at the September 1966 Criminal Session of Randolph and two on the jury panel at the November 1966 Session, and affidavits showing the racial balance in Randolph County establishing that Negroes number about nine per cent of the population of that County.

When the defendant rested, the solicitor for the State offered the evidence of Ira L. DcDowell, who testified as follows:

"As chairman of the Board of Commissioners of Randolph County I did supervise the compiling of the jury list that is now in effect in Randolph County. The grand jury for the 1966 terms of the Criminal Court of Randolph — the names were taken from this present jury list.

"The exact procedure that was used, and where the information was obtained, in making up the jury list that is now in effect in this county is as follows: The information was obtained from the books in the Board of Elections office — the registration books. And every person who had registered in Randolph County's *(sic)* name was copied. Then, when that was done, the list was taken to the tax office, and compared with the ones in the tax office, and the ones that didn't appear on this first list was taken then and put in the box.

"The jury list that is now in effect is a list taken from the registration lists and the tax records of Randolph County. Every name that appeared on either of these two lists was placed in the box. In preparing this list, there was not any designation on any of the jury lists as to race, creed or color. We copied the names and address and township. This is all that appears on the cards.

STATE *v.* BROWN.

"You can not tell, when you're drawing a jury list from Randolph County, from this list, the race or color of the individual's name you draw from the box. The jury list for the December — or for the November 28th Criminal Term of Randolph County, 1966 was drawn from this list. This list was put into effect April 20th, 1965. All of the jurors for the Superior Court of Randolph County since that date have been drawn from this list."

He testified on cross-examination:

"No effort has been made to include on this jury list such people as those who are on the welfare, welfare recipients, or people who have utilities, use public utilities, in Asheboro and Randolph County. I have not checked to see if there are people using public utilities, such as Carolina Power and Light or telephone service, whose names are not on the voter registration list. And, specifically since July 26th, 1966, the date of Judge Gordon, United States District Court Judge *(sic)* I have done nothing to correct the disparity in the number of Negro names in this jury list and bring it more into proportion with the number of Negro citizens in Randolph County."

At this point, counsel for defendant and the solicitor for the State said that was all the evidence they had. The court said: "I will deny your motion to quash the bill." In denying the motion, Judge Johnston entered an order in which he finds the following pertinent facts:

"2. The court has heard the evidence offered by the defendant and the arguments of counsel.

"3. That the Grand Jury who returned the bill of indictment a true bill was drawn from the jury box of Randolph County in the manner provided by law.

"4. That the jury box was prepared on July 1, 1965, with names taken from the tax records and voter registration records of Randolph County of July 1, 1965, and that each name that appeared on either of these records was placed in the jury box, but without duplication, at that time.

"5. That the names were on separate paper slips and that there was nothing on any of the names or paper slips that were placed in this box to indicate the person's race, creed, or color.

"6. That there is no sufficient evidence before this court to indicate in what proportion members of the white and Negro races' names appeared in the jury box.

STATE *v.* BROWN.

"7. That the Grand Jury who returned the bill of indictment a true bill was all white.

"8. That there is no sufficient information before the court as to the number of Negroes on the panel from which the Grand Jury was drawn, but that there was at least one Negro on the panel."

Based upon his findings of fact, he made this conclusion:

"The Court is of opinion that there was no systematic exclusion of Negroes from the Grand Jury of Randolph County that returned this bill of indictment a true bill and that no person was excluded because of race, color or creed."

Whereupon, he ordered that the motion to quash the indictment be and it hereby is denied. Defendant excepted and assigns that as error. After that was done, counsel for the defendant moved to quash the whole jury panel. The court denied the motion to quash the entire jury panel. After the denial of his motion to quash the indictment and the jury panel, the defendant entered a plea of not guilty. The defendant assigns as error the denial of his motion to quash the indictment and the denial of his motion to quash the panel of jurors.

Defendant is a Negro. As a Negro defendant he has no right to insist that he be indicted or tried by juries composed of persons of his race, nor to have a person of his race on the juries which indicted and tried him. But he has a constitutional right to be indicted and tried by juries from which persons of his race have not been systematically excluded — juries selected from qualified persons regardless of race. *S. v. Wilson,* 262 N.C. 419, 137 S.E. 2d 109; *Miller v. State,* 237 N.C. 29, 74 S.E. 2d 513; *S. v. Brown,* 233 N.C. 202, 63 S.E. 2d 99; *S. v. Koritz,* 227 N.C. 552, 43 S.E. 2d 77; *Hernandez v. Texas,* 347 U.S. 475, 98 L. Ed. 866; *Brown v. Allen,* 344 U.S. 443, 97 L. Ed. 469. The burden of proving discriminatory jury practice is upon defendant. *S. v. Wilson, supra; S. v. Covington,* 258 N.C. 495, 128 S.E. 2d 822; *Miller v. State, supra; Akins v. Texas,* 325 U.S. 398, 89 L. Ed. 1692. But this does not relieve the prosecuting attorney of the duty of going forward with the evidence when the defendant has made out a *prima facie* case.

In *S. v. Wilson, supra,* Judge Moore, speaking for the Court, said:

"When, at a hearing upon a motion to quash the bill of indictment, there is a showing that a substantial percentage of the population of the county from which the grand jury that returned the

bill was drawn is of the Negro race and that no Negroes, or only a token number, have served on the grand juries of the county over a long period of time, such showing makes out a *prima facie* case of systematic exclusion of Negroes from service on the grand jury because of race. *Arnold v. North Carolina,* 12 L. Ed. 2d 77; *Eubanks v. Louisiana,* 356 U.S. 584; *Norris v. Alabama,* 294 U.S. 587. The mere denial by the officials charged with the duty of listing, selecting and summoning jurors that there was any intentional, arbitrary or systematic discrimination because of race, is not sufficient to overcome such *prima facie* case. *Hernandez v. Texas,* 347 U.S. 475; *Smith v. Texas,* 311 U.S. 128; *Norris v. Alabama, supra.* To overcome such *prima facie* case, there must be a showing by competent evidence that the institution and management of the jury system of the county is not in fact discriminatory. And if there is contradictory and conflicting evidence, the trial judge must make findings as to all material facts."

Judge Gordon's memorandum opinion dealt with the composition of the grand jury that found the bill of indictment at the 22 June 1964 Session of Randolph County Superior Court. A new jury list was put into effect 20 April 1965 for Randolph County, as set forth above, and from this jury list were selected the grand jury that found the bill of indictment in the instant case and the petit jury that tried defendant. "Former errors cannot invalidate future trials." *Brown v. Allen, supra.* If racial discrimination in Randolph County was formerly practiced, as found by Judge Gordon in his memorandum opinion, but the jury list was thereafter properly revised and the law administered without discrimination, the former errors and practices would not affect the validity of an indictment returned after proper revisal of the jury system. Judge Johnston's findings of fact on the motion to quash are supported by ample competent evidence and are conclusive on appeal, "in the absence of some pronounced ill consideration" of the evidence by Judge Johnston. *S. v. Wilson, supra; S. v. Perry,* 250 N.C. 119, 108 S.E. 2d 447; *S. v. Speller,* 229 N.C. 67, 47 S.E. 2d 537, cert. den. 340 U.S. 835, 95 L. Ed. 613; *S. v. Kirksey,* 227 N.C. 445, 42 S.E. 2d 613; *S. v. Henderson,* 216 N.C. 99, 3 S.E. 2d 357; *S. v. Bell,* 212 N.C. 20, 192 S.E. 852; *Akins v. Texas, supra; Thomas v. Texas,* 212 U.S. 278, 53 L. Ed. 512. In other words, the findings of a trial judge will not be disturbed unless so grossly wrong as to amount to an infraction of the Constitution of the United States. *S. v. Wilson, supra; S. v. Cooper,* 205 N.C. 657, 172 S.E. 199.

In *Akins v. Texas, supra,* it is said:

"While our duty, in reviewing a conviction upon a complaint that the procedure through which it was obtained violates due process and equal protection under the Fourteenth Amendment, calls for our examination of evidence to determine for ourselves whether a Federal constitutional right has been denied, expressly or in substance and effect, *Norris v. Alabama,* 294 U.S. 587, 589, 590, 79 L. ed. 1074, 1076, 1077, 55 S. Ct. 579; *Smith v. Texas,* 311 U.S. 128, 130, 85 L. ed. 84, 86, 61 S. Ct. 164, we accord in that examination great respect to the conclusions of the State judiciary, *Pierre v. Louisiana,* 306 U.S. 354, 358, 83 L. ed. 757, 760, 59 S. Ct. 536. That respect leads us to accept the conclusion of the trier on disputed issues 'unless it is so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process.' *Lisenba v. California,* 314 U.S. 219, 238, 86 L. ed. 166, 182, 62 S. Ct. 280, or equal protection."

The record shows that Mr. Ingram showed by affidavit a list of jurors that served at the September 1966 Session of Randolph County Superior Court and at the November 1966 Session of Randolph County Superior Court, and that out of the fifty on the September panel one was a Negro, and that out of the thirty-six on the November panel two were Negroes. That is all the information in the record in respect to panels of jurors drawn from the jury boxes since the new list was prepared on 20 April 1965. This is said in Anno. 1 A.L.R. 2d 1291, at 1314: "There is abundant authority that the mere absence from a particular grand or petit jury, or from a particular jury panel, of members of the defendant's class or race is insufficient, in and of itself, to show discrimination against the defendant in the selection of the jury." In support of this statement, many cases are cited from the Supreme Court of the United States and from 15 state courts. Defendant's proof falls far short of showing that there has been any discrimination against the defendant because of his color or race, and does not show any exclusion of Negroes from serving on the grand jury of Randolph County or a trial jury of Randolph County *for some considerable period of time,* after a new jury list was put into effect on 20 April 1965. The tax list is perhaps the most comprehensive list available for the names of citizens, because in this day and time women as well as men are substantial taxpayers in this Nation. *S. v. Wilson, supra.* In this case the jury boxes, after the revision of the same on 20 April 1965, contained the names of all people on the tax list and on the voters' list. The fact that the chairman of the Board of County Commissioners testified that "no effort has been made to include on this

jury list such people as those who are on the welfare, welfare re-
cipients, or people who have utilities, use public utilities, in Ashe-
boro and Randolph County" means merely that if they were not in-
cluded in the jury list, they were not on the tax list and not on the
registration list of voters. The positive testimony of the chairman of
the Board of County Commissioners is that if those receiving wel-
fare were on the tax list or on the registration list for voters, that
they were included in the jury list. Considering the racial composi-
tion of Randolph County, it is reasonable to infer that more white
people were receiving welfare payments than Negroes. If any were
excluded because they were not on the tax list or not on the registra-
tion list for voters, it is apparent that more white people were ex-
cluded than Negroes. The fact that the chairman of the Board of
County Commissioners said "and, specifically since July 26th, 1966,
the date of Judge Gordon, United States District Court Judge *(sic)*
I have done nothing to correct the disparity in the number of Negro
names in this jury list and bring it more into proportion with the
number of Negro citizens in Randolph County," does not mean that
he did not correct the disparity when he revised the jury list on 20
April 1965 when he placed in the jury boxes all people who had listed
property for taxation and all people who had registered to vote.
There is some very slight disparity in the number of Negro residents
of Randolph County and the number of white residents of Randolph
County as set forth in defendant's motion to quash the indictment
and Judge Gordon's memorandum opinion, but only to the extent
of a very, very few, and as such it is not material. Even if we
should concede, which we do not, that the defendant made out a
*prima facie* case showing racial discrimination in the jury list be-
cause only three Negroes were summoned to appear at the Septem-
ber 1966 and November 1966 Sessions of the Superior Court of
Randolph County, it is our opinion, and we so hold, that the State's
evidence is sufficient in purport and content to overcome defendant's
*prima facie* showing of racial discrimination; and Judge Johnston's
findings of fact and conclusion that there was no systematic exclu-
sion of jurors from the grand jury of Randolph County that re-
turned the bill of indictment a true bill and that no person was ex-
cluded because of race, color or creed are amply supported by com-
petent evidence, and are conclusive on appeal because the compe-
tent evidence supporting Judge Johnston's findings of fact and con-
clusion and adjudication are not so lacking in support that to give
them effect would work "that fundamental unfairness which is at
war with due process." See *S. v. Perry, supra,* for an analysis of our
statute law in respect to the preparation of the jury list and the

drawing of the original panel, and the drawing of the grand jury from the original panel. Consequently, the court properly denied defendant's motion to quash the bill of indictment, and correctly denied the motion to quash the panel of jurors.

In *Arnold v. N. C.*, 376 U.S. 773, 12 L. Ed. 2d 77, and in *Eubanks v. Louisiana*, 356 U.S. 584, 2 L. Ed. 991, the Court found that there had been a systematic exclusion of Negroes from the jury service *for a considerable period of time*. Such is not the case here.

Defendant assigns as error the court's denial of his motion for a change of venue because of newspaper publicity of such nature that he would be unable to have a fair trial in Randolph County. The record shows that before the jury was impanelled several jurors stated that they had read articles in the Courier-Tribune about this case, whereupon the court made the following statement:

> "COURT: Now, members of the jury, as has already been suggested, the purpose of these questions that have been propounded to you by counsel in the case has been to obtain an entirely fair jury. Is there any member of this jury as it is presently constituted that knows of any reason — whether you have been asked about it or not — why you feel that you couldn't render to the State of North Carolina, and to this defendant, a completely fair and impartial verdict? If so, the court would like for you to indicate by raising your hand."

There was no response. Whereupon, the jury was impanelled. Defendant's motion for a change of venue was addressed to the sound legal discretion of Judge Johnston, and in the light of what Judge Johnston said to the jury before they were impanelled and the fact that no juror raised his hand in respect to the question does not show any abuse of discretion. This assignment of error is overruled. *S. v. Porth*, 269 N.C. 329, 153 S.E. 2d 10; *S. v. Scales*, 242 N.C. 400, 87 S.E. 2d 916.

The evidence for the State in the present record is substantially similar to the evidence in the record as set forth in the opinion in this case on the first appeal. *S. v. Brown, supra*. For that reason it would serve no useful purpose to set it forth in detail again in this case. The State's evidence in brief summary is that Lucille Currie was admitted about 2:15 a.m. on 16 March 1964 in the emergency room of Randolph Hospital in Asheboro with severe burns over about 70% of her body, from which she died some 25 hours thereafter. While in the hospital she made dying declarations to the effect that defendant poured gasoline on her, struck a match, and set her on fire.

Defendant assigns as error the admission in evidence of statements of dying declarations. These assignments of error are overruled. The State's evidence on this appeal and on the former appeal showed that at the time the declarations were made by Lucille Currie that she must have been in actual danger of death, that she must have had full apprehension of a *speedy and inevitable death*, because all men are mortal and know it, and death ensued about 24 hours after she was burned. *S. v. Brown, supra.*

Defendant assigns as error the admission of evidence in respect to a search of defendant's automobile after he was arrested and placed in jail, and to the testimony of an officer that they opened the doors of the automobile and looked inside and there was a strong odor of gasoline in the car. The officer testified that the defendant gave permission for the search. This assignment of error is overruled. It is well-settled law that a person may waive his right to be free from unreasonable searches and seizures. "No rule of public policy forbids its waiver." *Manchester Press Club v. State Liquor Com.*, 89 N.H. 442, 200 A. 407, 116 A.L.R. 1093. It has been repeatedly decided in this jurisdiction, in the United States Supreme Court, and the Courts of this Nation that one can validly consent to a search of his premises, and consent will render competent evidence thus obtained. *S. v. Hamilton*, 264 N. C. 277, 141 S.E. 2d 506; *S. v. Coffey*, 255 N.C. 293, 121 S.E. 2d 736; *S. v. McPeak*, 243 N.C. 243, 90 S.E. 2d 501, cert. den. 351 U.S. 919, 100 L. Ed. 1451; *S. v. Moore*, 240 N.C. 749, 83 S.E. 2d 912; *Zap v. United States*, 328 U.S. 624, 90 L. Ed. 1477; *United States v. Mitchell*, 322 U.S. 65, 88 L. Ed. 1140; *United States v. Page*, 302 F. 2d 81; *Nelson v. United States*, 208 F. 2d 505; *People v. Preston*, 341 Ill. 407, 173 N.E. 383, 77 A.L.R. 631; *State v. King*, 44 N.J. 346, 209 A. 2d 110, 9 A.L.R. 3d 847, and Annotation thereto in A.L.R. 3d, *ibid*, beginning at p. 858; 79 C.J.S., Searches and Seizures, § 62; 47 Am. Jur., Searches and Seizures, §§ 71-72; Annot. 31 A.L.R. 2d 1078.

The record contains 104 assignments of error and more than 104 exceptions. A number of these assignments of error are that the court sustained an objection to a question asked the witness by defendant's counsel, but the record does not disclose what the reply of the witness would have been if he had been permitted to answer; consequently, it is impossible for us to know whether the ruling was prejudicial to the defendant or not. The burden is upon the appellant not only to show error but to show that such error was prejudicial to him. All assignments of error of this nature are overruled. *S. v. Poolos*, 241 N.C. 382, 85 S.E. 2d 342.

The record contains many assignments of error of which these are typical:

"75. The court erred in overruling defendant's objection. EXCEPTION No. 75 (R. p. 187).

"76. The court erred in overruling defendant's objection. EXCEPTION No. 76 (R. p. 191).

"77. The court erred in overruling defendant's objection. EXCEPTION No. 77 (R. p. 191).

"78. The court erred in overruling defendant's objection. EXCEPTION No. 78 (R. p. 196).

"79. The court erred in overruling defendant's objection. EXCEPTION No. 79 (R. p. 201).

"While the form of the assignments of error must depend largely upon the circumstances of each case, they should clearly present the error relied upon without the necessity of going beyond the assignment itself to learn what the question is. Thus, they must specifically show within themselves the questions sought to be presented, and a mere reference in the assignment of error to the record page where the asserted error may be discovered is not sufficient." 1 Strong's N. C. Index 2d, Appeal and Error, § 24. All assignments of error of this character are overruled.

The defendant in his brief cites very meager authority in support of his contentions. All defendant's assignments of error have been carefully examined and all are overruled.

The judgment of the court in the first case was that defendant should be confined in the State's prison for a period of 20 to 25 years. This is the judgment in the instant case: "It is the judgment of this court that the defendant be confined in State's Prison for a term of twenty-five (25) years. It appearing to the court that upon a previous conviction that the defendant has served a period of time between January 25, 1965, and July 26, 1966, which conviction was set aside July 26, 1966 by the Federal Court. It is the intention of the court for the Prison Department to give the defendant credit for time served under the previous sentence which was vacated by the Federal Court on July 26, 1966." It is the order of this Court that the prison Department shall give the defendant credit for time served under the previous sentence which was vacated by the Federal Court on 26 July 1966. *S. v. Weaver,* 264 N.C. 681, 142 S.E. 2d 633.

In respect to the increased sentence on the second trial, this is

to be noted: In the first trial defendant did not testify in his own behalf. In the second trial defendant did testify in his own behalf wherein he admitted that he had been convicted in the State court and served a prison term for the possession for the purpose of sale of intoxicating liquor and had been convicted once in the Federal court for whiskey, in response to numerous questions asked him by the prosecuting officer if he had not been convicted many times for the possession for sale of whiskey and other offenses, he said he could not deny it but he could not remember. See: *U. S. ex rel. Starner v. Russell* (3rd Circuit — 25 May 1967), 35 U.S.L.W. 2706.

Defendant has shown no error by his 104 assignments of error that would justify a new trial.

In the trial below we find

No error.


PLESS, J., concurring:

Here we have another example of the right of unbridled, unrestricted and unlimited appeal.

The facts set forth in the previous appeal by our able Chief Justice Parker show that the defendant suspected his girl friend of two-timing him. Without proof, he condemns her to die. He forces her into his car, telling her he is going to kill her. Having procured a half gallon of gasoline for his savage purpose two hours earlier, he deliberately throws it on her clothes and strikes a match to ignite them. She dies in agony a day later, after telling the above story several times. The defendant has yet to deny its truth except by his formal plea of not guilty.

Upon the first trial his life was saved when the State did not seek the death penalty. Upon conviction of second degree murder the court imposed less than the maximum penalty for that offense. With that, the defendant should have been content — if not exuberant.

But no! With the tendencies of some courts (not this one) to protect the "rights" of criminals — and, by corollary — to overlook and ignore the rights of the public, and the victims, he seeks and obtains a new trial. He has nothing to lose, and all to gain. He can never be tried again for more than second degree murder; his appeal is at the public expense for the cost of the record and a State-paid lawyer to represent him. Why should he not pursue, and continue to pursue, even after this, his all-to-gain and nothing-to-lose, opportunities?

His complaint at this time (he will have others on his later, all-expense-paid motions and appeals) is that he was discriminated against because the grand jury and trial jury contained too few

Negroes. After thirty-two years on the Superior Court bench, I can say that he is most fortunate that he was not tried upon a first degree murder charge before an all-Negro jury. It would have promptly returned a verdict that invoked the death penalty. One of the major complaints of the responsible Negroes is that the courts do not impose sufficient penalties when one Negro kills another. They insist that the death of a Negro, even though caused by another, deserves more punishment than is usually imposed.

No one would deny that a person charged with crime should have his rights fully protected. But neither can it be denied that the object of government and law is primarily to protect the public from murder, burglary, rape and other offenses. From my viewpoint, it would seem that the latter has been relegated to an unrealistic and impractical position and that the criminals are given more than their "rights" while the safety and security of our good citizens are, to an alarming degree, diminished.

I fully concur with the opinion.